EBEN FRANKLIN BALDWIN *v.* JOSEPH BENNETT and others, Owners of the Steamer John Jay.

The provision of the 17th sect. of the act of 10 February, 1841, which declares that the cases then pending before the District Court of the First District, and the Parish and Commercial Courts of New Orleans, "shall be stricken from the jury docket, unless the compensation fixed by that act to be allowed to jurors, be advanced by the party demanding a trial by jury," is not unconstitutional. *Per Curiam.* Under the twentieth section of the sixth article of the State Constitution no acquired rights, or existing contracts can be affected by subsequent legislation ; but it is otherwise as to remedies and forms of proceeding. Whatever relates to the manner of conducting and trying a suit, (*litis ordinatio,*) is always within the control of the Legislature, which can, at any time, make any change, or modification it may think conducive to the public good and the proper administration of justice.

APPEAL from the Parish Court of New Orleans, *Maurian,* J.
*J. C. Clarke,* for the plaintiff.
*Van Matre,* for the appellants.
MORPHY, J.* This suit is brought to recover the sum of four

* This opinion was delivered in June, 1843. So much of it as was overruled by the subsequent opinion on the re-hearing, is omitted.

hundred dollars, alleged to be due to the petitioner, for his services as pilot on board the steamer John Jay during two months, at the rate of $200 per month, commencing on the 16th of November, 1838.

The defence is, that on or about the time mentioned in the petition, the plaintiff engaged and agreed to serve as a pilot on board of the John Jay in the Arkansas trade, and to continue thereon from that time, until the expiration of the steamboat season on the Arkansas river, which usually terminates on or about the 1st of July of each year; that on the 10th of January, 1839, the boat left this city, with a full cargo of freight and a lot of passengers, for Fort Smith, on the Arkansas river, and the intermediate landings; that on or about the 16th of January, at the mouth of White river, and when the voyage had but fairly commenced, and long before the termination of the season, the plaintiff, without any just cause therefor, and without any previous intimation of his intention so to do, deserted and abandoned the John Jay, contrary to the will of the captain thereof, and took a birth as pilot on board the steamboat Burlington, engaged in the same trade; that as no pilot could be had at the mouth of White river to supply the place of the plaintiff, the captain was compelled to run the boat to Fort Smith, and return to New Orleans with but one pilot on board, lying by a part of every night, and sustaining damage by the wrongful conduct and breach of contract of the plaintiff, in the sum of $500, which is pleaded in reconvention. There was a judgment below for three hundred and seventy-five dollars in favor of the plaintiff. The defendants have appealed.

Our attention has been called to a bill of exceptions taken by the defendants, to the opinion of the inferior Judge refusing to reinstate this case on the jury docket, from which it had been stricken, in obedience to the 17th section of the act approved the 10th February, 1841, entitled " An act to create two additional Sheriffs for the parish of Orleans, to fix the place of holding courts of justice, and for other purposes." The ground taken was, that so far as the statute tends to regulate and control the trial of cases which were instituted, and in which juries were prayed for prior to its passage, it violates the twentieth section of the sixth article of the Constitution of the State, and is, therefore, void. The

Baldwin v. Bennett and others.

Judge was clearly right. Under the constitutional provision re-lied on, no acquired rights and existing contracts can be affected by subsequent legislation; but it is otherwise with regard to re-medies and forms of proceeding. Whatever relates to the man-ner of conducting and trying a suit, (*litis ordinatio,*) is always within the control of the Legislature, who can, at any time, make any change or modification they may think conducive to the public good, and a proper administration of justice in our courts.

## SAME CASE—ON A RE-HEARING.

Action by the plaintiff for two months wages as the pilot of a river steamer. It was proved that he had been employed for the season, at certain wages, payable month-ly; that having determined to leave the boat, he applied to the clerk in the middle of a voyage, for the payment of two months wages then due, who refused to pay him then; that he never applied to the captain for payment, never informed him of the refusal of the clerk, nor gave him any notice of his intention to leave. It was shown that the captain remonstrated with him for leaving, and that his departure injured the voyage; also that the steamer had made one or more voyages during the first month, and had earned freight, by which the defendants were benefited. *Held,* that nei-ther the expiration of the month, nor the failure to pay his wages, for which the law gave him a privilege on the vessel, justified the plaintiff in leaving the steamer du-ring the voyage; that by doing so, he forfeited the wages of the last month; but that one or more voyages having been made during the first month, by which freight was earned, plaintiff should have been paid the wages of the first month, and that they were not forfeited by his subsequent desertion.

The well settled principles of maritime law, that where an officer or seaman employed for a voyage, at monthly wages, voluntarily leaves the vessel, before its termina-tion, without good cause, or the assent of the master, he will forfeit his wages— that if the vessel be lost and earns no freight, the mariner gets no pay, though en-gaged by the month—and that even where no definite voyage is specified or *termi-nus* fixed, the contract is subject to the equitable restriction that it shall not be ter-minated at a time, or under circumstances particularly inconvenient to the other party, should be extended as far as applicable, to persons engaged in the navigation of our rivers and along our coasts.

GARLAND, J. On the application for a re-hearing, we have again attentively looked into the facts of this case, and the law which governs it, and have concluded to modify our former judg-

ment. The pretext of the plaintiff for leaving the boat during her voyage was, that two of the months for which he had been en gaged had expired, and that his wages had not been paid to him. The evidence shows very satisfactorily, that he had determined to leave the boat, before he applied for the payment of his wages. When at the mouth of the Arkansas river, bound up, he left a message for the captain of the steamer Burlington, stating that he should leave at the mouth of White river. He also informed the other pilot on the boat of his intention to quit, and of his having received a communication from the captain of the Burlington, who wished to employ him. It is further shown, that at the mouth of White river he made all his preparations to leave, before he applied to the clerk for his wages. He never did apply to the captain for payment; nor did he give him any notice of his intention to leave his service until after he had done so, nor did he inform him of the refusal of the clerk to pay, before doing so. When the captain heard that the plaintiff had left, or was about doing so, he remonstrated against it, and told him of the injury he would pro bably sustain, by being left during the voyage : and further, that if he would continue until the boat returned to New Orleans, he would pay his wages, and consent to his discharge. This the plaintiff refused to do. It also clearly appears, that the boat was considerably delayed on the voyage, in consequence of having but one pilot, which caused the owners some loss.*

It is a well settled principle of maritime law, that if, on a voy-age, an officer or seaman voluntarily leaves the vessel, without good cause, or the assent of the master, he thereby not only for-feits his wages, but in some cases is liable to be arrested as a deserter and punished ; and it makes no difference whether he is employed for the voyage, or at monthly wages. See Rights and Duties of Merchant Seamen, p. 62, 69. The contract, when on a voyage, is not determinable by either party at the expiration of each month. If it were, a vessel in the middle of a voyage might be abandoned by her whole crew, and no one left to navigate

---

* The clerk testified that the plaintiff had been employed for the season, at the rate of $200 month, payable monthly.

her. The contract extends to the voyage, at the rate of so much per month ; and if the vessel is lost, and earns no freight, the mariner gets no pay, although he is engaged by the month. Even where no definite voyage is specified, or *terminus* fixed, and, of course, an end can be put to the contract at any time, yet it is " subject to the equitable restriction that this shall not be done at a time, or under circumstances, particularly inconvenient to the other party." Ware's Rep. 437. Pothier says, the obligation does not cease until the end of the voyage and the discharge of the vessel ; and it is the same, whether the hiring is by the month or voyage ; and the only difference is in the mode of payment. *Traité du Louage des Matelots.* We are of opinion that these well settled principles of law, should extend, so far as they are applicable, to persons engaged in the navigation of our rivers, and along our coasts. Steamboats sometimes make voyages, as long as vessels engaged in foreign trade, and are often in places where neither competent officers, nor hands can be procured. Under such circumstances, it would not only be highly injurious to individuals, but to commerce, if it were permitted to the officers and crew, or any portion of them, to leave, because the month for which they were engaged had expired. Captains and owners of steamboats, should punctually discharge their engagements to the officers and men in their service ; but if they do not, it does not justify them in deserting the vessel on a voyage. The law gives them a lien to secure the payment of their wages, and they must not leave the vessel on which it exists, when there is the greatest need for their services. We have finally come to the conclusion, that the plaintiff was not justifiable in leaving the John Jay when he did, and that he should forfeit the wages of one month. The defendants contend that the wages of both months should be forfeited ; but we do not think they should. The boat made one or more voyages during the first month, and earned freight, by which the defendants were benefited, and at the end of it, they ought to have paid the plaintiff his wages. Had they done so, there could have been no forfeiture of them.

The counsel for the plaintiff contend, that as he was shipped at the mouth of White river and had returned there, and it was a place where pilots for the Arkansas river were often to be found,

and could be engaged, their client had a right to leave the boat at the end of the month, without notice. Had the mouth of White river been one of the *termini* of the voyage, this would probably be correct; but it was not. The plaintiff knew when he left the port of New Orleans, that the steamer was engaged on a much longer voyage, and that the freight would not be earned, unless she reached her point of destination. It was his duty to do all in his power to effect that object, and to enable the vessel to earn the means to pay him. If a mariner were to ship on board a vessel in the port of Havanna, bound to New Orleans, at a certain rate per month, and from thence the vessel should depart on a voyage to Liverpool and touch at Havanna, it could not be contended that the mariner would have a right to desert the ship, simply because he had returned to the place he went from, the month had expired, and other mariners could be procured at that place. He would be bound to remain, because he was then bound on another voyage. A change of a portion of the crew in an intermediate port, sometimes produces a forfeiture of a policy of insurance.

It is, therefore, ordered and decreed, that the judgment of this court, affirming the judgment of the Parish Court, be so modified, that the plaintiff recover of the defendants, *in solido*, the sum of two hundred dollars, with a privilege and lien on the aforesaid steamboat John Jay, to secure the payment of the same, together with the costs in the lower court, those on the appeal to be paid by the plaintiff.